Filed 10/14/20

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CARLOS RAZO CERVANTES,<br><br>  Defendant and Appellant. | F077943<br><br>(Super. Ct. No. BF165489A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., and IV. of the Discussion.

# INTRODUCTION

Defendant Carlos Razo Cervantes stands convicted, following a jury trial, of the first degree murders of Jose Ceja (Ceja) (count 1) and Jeffrey Villegas (Villegas) (count 2). (Pen. Code, § 187, subd. (a).)[1] As to both counts, the jury found true a multiple murder special circumstance (§ 190.2, subd. (a)(3)), and found that defendant personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and personally and intentionally discharged a firearm during the commission of a violation of section 187, subdivision (a) (§ 12022.53, subd. (c)). Defendant was sentenced to two consecutive terms of life without the possibility of parole, plus a consecutive term of 50 years to life.

On September 4, 2016, Ceja and Villegas were shot and killed. Three days later, defendant confessed to those shootings. On January 1, 2017, section 859.5, which until then applied to custodial interrogations of minors, was amended so it applied as well to custodial interrogations of adults. On appeal, defendant contends his confession was rendered inadmissible by the 2017 amendments to section 859.5 and so his convictions must be reversed. In the published portion of this opinion, we conclude the 2017 amendments to section 859.5 do not apply retroactively to bar admission of defendant's confession.

Defendant also contends the trial court reversibly erred in admitting his confession because it was involuntary and occurred after he invoked his privilege against self-incrimination. He further contends the omission of the word "or" from the court's instruction on involuntary intoxication prejudiced the jury's ability to consider whether he committed the murders with deliberation and premeditation. Finally, he contends the court prejudicially erred in instructing the jury on flight because there was no evidence to support the instruction. In the unpublished portion of this opinion, we conclude

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

defendant's confession was voluntary and was not obtained in violation of his privilege against self-incrimination. We further find no error in the instructions but, in any event, conclude any error was harmless.

We affirm.

## FACTUAL BACKGROUND

In the evening hours of September 4, 2016, Villegas and Ceja were fatally shot in the front yard of Villegas's home in Delano. Villegas's body was found near the front door, and Ceja's body was found in the yard next to a tractor trailer. Both men died of multiple gunshot wounds and were pronounced dead at the scene. Villegas was shot twice in the chest, resulting in massive hemorrhaging from his heart, aorta, and other organs. He also was shot through his right forearm. Ceja was shot once in the arm and once in the back. Both projectiles entered his chest and caused massive damage to multiple vital organs. One projectile was recovered from each of the men's bodies. Law enforcement determined the men were shot with a Glock firearm.

Defendant lived in the house immediately to the west of Villegas. Lounito V. lived in the house immediately to the east. Jose F. and Anna Z. lived with Villegas. As set forth below, these individuals and others provided testimony regarding the night of the incident.[2]

### I.   *Events Leading Up to the Shooting*

On the evening of September 4, 2016, defendant, Lounito, Roland C., Roberto C., and Jesus H.[3] were standing in front of defendant's house, talking. Defendant was drinking. After approximately 10 minutes, Roland left the conversation and walked to Lounito's house to use the WiFi.

---

[2]   Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[3]   Roberto is referred to by various witnesses solely as "Bobby." Jesus is referred to by some witnesses as "Chuy."

3.

Eventually, Ceja arrived at Villegas's house and waited outside.[4]  Thereafter, Lounito and the others began to leave defendant's front yard.  Around the same time, Villegas pulled up to his own house.  Defendant became agitated and angry, and said, "I'm gonna get him."  Villegas walked toward his own front door.  Lounito and Roberto walked toward Lounito's house, with Roberto in the lead.  Jesus walked off in the same direction as Lounito and Roberto.

## II.     The Shooting

Roberto testified that he was walking toward Lounito's house when he turned around and saw defendant walking toward Villegas's house with something in his hand and he heard a clicking sound.  He acknowledged he previously told police that he saw defendant enter Villegas's property with a gun and heard him rack the gun.  Roberto heard two shots, then heard Villegas screaming, "I didn't say anything, Carlos," followed by four more shots.  Soon after, he saw defendant leaving Villegas's property in the direction of defendant's house.  After the shooting, Roberto left.  He eventually spoke with Roland and learned that Lounito had been taken in for questioning; he then spoke to police.

Lounito testified that he had taken a few steps into his driveway when he heard Villegas yell, "I didn't say anything.  I didn't say anything," followed seconds later by several gunshots.[5]  Lounito continued toward the front of his house and waited a couple of minutes.  When nothing further happened, Lounito went to his truck, which was parked in front of Villegas's house, and drove it around the block and back to his own driveway.  When he returned, Roberto was gone.  Lounito went inside his house with Roland, who had remained in Lounito's yard.

---

[4]     Ceja is referred to by some witnesses as "Chema."

[5]     Lounito testified pursuant to a grant of use immunity.

Roland testified that he was sitting at a patio table in Lounito's front yard when Roberto entered the yard. Roland heard two shots from somewhere very close, followed by Villegas screaming, "No. No, I wasn't talking shit." Roland then heard two more shots, followed by four shots in a row. Roland saw defendant leave Villegas's residence and walk back toward defendant's house.[6] Roberto left immediately. Roland began packing his belongings. Lounito stated that he needed to get his truck, and also to return defendant's dog, which had gotten loose. Roland waited for Lounito to return, and they then went inside the house. Roland went into the restroom and opened the window to listen for sounds from Villegas, but heard nothing. After Roland left the restroom, defendant called Lounito twice. Lounito answered the second call and said, "Okay. I'll be right there." Roland prevented Lounito from going outside. Roland and Lounito looked at Lounito's surveillance cameras and did not see anyone outside the house. They then heard Jose outside calling for help. Lounito went outside and looked around, then returned and told Roland not to touch anything. Roland went home.

Jose and Anna testified that they arrived at Villegas's house, where they were living rent free, as it was getting dark, and they sat in the car for approximately five minutes. When Anna got out of the car, she saw Ceja on the ground underneath a tractor trailer. She thought he was asleep and told Jose, who pulled Ceja from under the vehicle and realized he was not breathing. Jose began giving Ceja CPR. They also saw Villegas on the ground near the front door. Anna called 911. They called out to the neighbors and Lounito came out. Jose took an inoperable gun from his car and asked Lounito to hold it because he did not want anyone thinking it was used in the murders. Jose and Anna were locked out of the house and did not have a place to stay. Lounito paid for them to get a motel room.

---

[6]     Roland testified that he is completely blind in his right eye due to being shot 20 years prior.

Lounito confirmed that, at some point "a long time" after the gunshots, he stepped back outside to see what was happening and heard Villegas's roommates, Jose and Anna, calling him frantically. Lounito went to Villegas's yard and saw Villegas on the ground near the front door and Jose trying to resuscitate Ceja. During this period, defendant briefly came into the yard and began picking up spent shells; he did not say anything. Jose gave Lounito a gun and Lounito put the gun in a tub in his front yard. He then waited with Jose and Anna for the police to arrive.

### III.    The Investigation

Police officers from the Delano Police Department arrived at Villegas's residence at approximately 8:30 p.m. They found Ceja next to the tractor trailer and Villegas next to the front door. Villegas had no pulse and Ceja had a weak pulse. They did not locate any weapons near either victim. Shell casings and live rounds were found near the victims. The casings were determined to be nine-millimeter casings from a Glock handgun, the same kind used to shoot Villegas and Ceja.

Officers searched Jose for weapons but did not find any. Jose denied any knowledge of who committed the shooting. He told police he had once seen defendant fire a gun during a barbecue. Jose thought the gun belonged to Lounito. He also told police that, a few days before the incident, he saw defendant approach a vehicle Villegas was in, pull out a gun, and state, "Tell me why I shouldn't shoot you right now." Villegas responded that he would get defendant's money.

Officers seized surveillance video from Lounito's residence for the night of the incident. Early the following morning, officers determined that the video showed someone on Lounito's property holding a firearm, and they suspected Lounito was that individual. Lounito was taken into custody. The video also showed defendant coming into Lounito's front yard on the evening of the incident.

While in custody, Lounito told a detective that he was not home at the time of the shooting and did not hear any gunshots. When confronted with evidence indicating he

6.

was at home, Lounito claimed he could not have heard gunshots over the sound of his television, fan, and air conditioner. At trial, Lounito testified that he lied to police because he believed his life was in danger.

Lounito owned several guns. He also had a magazine for a nine-millimeter Glock firearm, as well as nine-millimeter rounds. He told police the Glock had been stolen from his car and never reported. He later told police he gave the gun to defendant.

According to Lounito, Villegas owed Lounito $4,000 for bailing him out of jail, and Villegas was not making payments. Two days before the shooting, Lounito told Villegas he needed to pay because the bail bondsman was calling about the money. Lounito told officers about this debt and acknowledged that he was upset about it.

## IV.    *Defendant's Statements*

Defendant was interviewed at his home on September 7, 2016, three days after the incident, by Delano Police Detective Scott. Defendant told Scott that he was in Bakersfield on the night of the incident and could not return to his home that evening because the area was cordoned off by police. He denied going to either Villegas's or Lounito's house that evening. He stated that he had done repair work for Villegas and had received only a partial payment. Defendant told Scott he was struggling and eating food from the garbage while Villegas was living rent free.

Following this conversation, Scott arrested defendant and transported him to the police department. There, Scott interviewed defendant again. A video recording of the interview was played for the jury. In the interview, defendant stated that he went to Bakersfield at approximately 7:00 p.m. He stopped at a gas station and then received a call from his aunt telling him something had happened on his street. He drove back home, but his street was blocked off, and he was not able to return. He slept at his aunt's house that night and returned home the next morning by going through an alley and jumping over the fence.

7.

Defendant denied going to Villegas's house that night and denied shooting him. He admitted he went to Lounito's house before going to Bakersfield. He claimed he knocked on the door, but no one answered, and he went home. Approximately five minutes later, Lounito called defendant and told him his dog had gotten loose, and that Lounito would put the dog back in defendant's yard.

Defendant initially stated he did not hear any gunshots that night because he was not home. He later acknowledged he heard four or five gunshots before he left for Bakersfield. When he left his house, he saw Jose and his girlfriend yelling for help, and saw a body.

Defendant stated that Villegas owed him $2,500 for building a wall for him, but had only paid him $400. Villegas made payments, but could never pay the full amount. According to defendant, Villegas was living rent free and did not care about paying defendant. Defendant had not talked to Villegas about the money for several months.

Defendant mentioned several times that he was the caretaker for his grandfather and was concerned because his grandfather was home and defendant did not like leaving him alone.

After the interview, Scott took defendant to a processing area outside the interview room. While being booked, defendant suggested he would tell Scott what happened if Scott permitted him to talk to his grandfather.[7] Defendant then admitted he shot Villegas out of rage because Villegas was living better than him. He shot Ceja because Ceja was a witness. He drove to a "chop shop" in Bakersfield that same night to "melt[] down" the gun.

---

[7] The circumstances surrounding this confession are discussed in greater detail in Discussion, section II., *post*.

## V.    *Defense Evidence*

Delano Police Officer Mendoza testified that he spoke with Lounito on the night of the shooting.  Lounito reported that he left his house around 8:00 p.m., and that he did not hear any gunshots or walk onto Villegas's property.  Mendoza noticed a camera affixed to the front of Lounito's house and asked whether it was working and recording.  Lounito responded that the camera did work but did not record.

## DISCUSSION

## I.    Section 859.5

Section 859.5, which requires the electronic recording of certain custodial statements, was amended after defendant confessed to the shootings.  Defendant contends the amendments should apply retroactively to his confession.  He further contends the amendments would render his confession inadmissible, and reversal is therefore required.  To the extent these arguments are forfeited, he claims ineffective assistance of counsel.  The People contend defendant's arguments are forfeited and also lack merit and, regardless, reversal is not the appropriate remedy.

We exercise our discretion and consider defendant's contention on the merits.  As a result, we need not address defendant's ineffective assistance of counsel claim.  (See *People v. Hardy* (1992) 2 Cal.4th 86, 209.)  We conclude the 2017 amendments to section 859.5 do not operate retroactively.  Accordingly, we find no reversible error.

### A.    Additional Background

Defendant confessed to the shootings on September 7, 2016.  At that time, section 859.5 required that the custodial interrogation of *a minor* suspected of committing murder be recorded in its entirety.  (Former § 859.5.)  However, this requirement did not apply to defendant, who was an adult.  Defendant's confession was recorded on a cell phone in four separate clips, rather than in an uninterrupted recording.  The booking conversation that precipitated the confession was not recorded.

9.

Effective January 1, 2017, section 859.5 was amended to require, with limited exceptions, that the custodial interrogations of *all* persons suspected of committing murder, whether adult or minor, be recorded in their entirety. (§ 859.5, subds. (a), (b), (d); Stats. 2016, ch. 791, § 2.) If the recording requirement is not met, and the interrogation is not subject to one of several enumerated exceptions, the court may consider law enforcement's noncompliance in adjudicating any motions to suppress the statements and in determining whether the statement was involuntary or unreliable, and shall instruct the jury to view with caution the statements made in that custodial interrogation. (§ 859.5, subd. (e).)

On June 28, 2018, defense counsel filed her motions in limine, including her motion seeking to suppress defendant's confession on the ground it was the product of improper promises and therefore involuntary. Therein, defense counsel noted that section 859.5 had recently been amended to require "electronic recording of the entire custodial interrogation of any person suspected of committing murder." Counsel argued that "[t]he failure to record the statement taken at processing in its entirety . . . makes the accuracy and meaning of the statement subject to question." Counsel did not specifically argue that the amendments to section 859.5 applied retroactively, or that the confession should, accordingly, be suppressed.

### B. Law Regarding Retroactivity

"Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent." (*People v. Brown* (2012) 54 Cal.4th 314, 319 (*Brown*).) In determining legislative intent, " ' "[w]e begin by examining the statute's words, giving them a plain and commonsense meaning." ' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1421; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 879-880 (*Buycks*).) "But the statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme." (*Buycks*, at p. 880; accord, *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) " '[W]e consider the language of the entire scheme and related

10.

statutes, harmonizing the terms when possible.' " (*Gonzalez*, at p. 1141.) We presume the Legislature, in enacting a statute, "was aware of existing related laws and intended to maintain a consistent body of rules." (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199.)

"No part of the Penal Code 'is retroactive, unless expressly so declared.' (§ 3.) '[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] . . . must have intended a retroactive application." [Citations.] Accordingly, " 'a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective.' " ' " (*Buycks*, *supra*, 5 Cal.5th at p. 880.)

Despite the foregoing, a "limited rule of retroactivity" applies to newly enacted criminal statutes that are intended to ameliorate criminal punishment. (*Buycks*, *supra*, 5 Cal.5th at p. 881 [discussing *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*)].) "The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*Buycks*, at p. 881.)

## C.     Analysis

Defendant concedes "[s]ection 859.5 does not expressly state that its provisions apply retroactively" and that the legislative history of section 859.5 does not clearly indicate the Legislature intended for the amendments to have retroactive application. Defendant further concedes the amendments to section 859.5 do not reduce punishment for a class of crimes. Nonetheless, he contends *Estrada*, *supra*, 63 Cal.2d 740 applies because the amendments to section 859.5 provide a clear and significant benefit to defendants.

11.

Our Supreme Court articulated the reasoning behind the *Estrada* rule as follows:

"When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

Recently, our Supreme Court revisited the *Estrada* rule. In *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303 (*Lara*), our high court concluded a prohibition in Proposition 57 (the Public Safety and Rehabilitation Act of 2016) against direct charging of juveniles in adult court applied retroactively. The court noted that *Estrada* was not "directly on point" because Proposition 57 reduced punishment for a class of persons, rather than for a crime. (*Lara*, *supra*, at pp. 303-304.) Nonetheless, the court concluded, the electorate's apparent determination that the former system of direct filing was too severe created an inference that the ameliorative benefits of Proposition 57 were intended to extend as broadly as possible. (*Lara*, *supra*, at pp. 309-310 [adopting the reasoning of *People v. Vela* (2017) 11 Cal.App.5th 68, 80 (judg. vacated and cause remanded, reaffd. (2018) 21 Cal.App.5th 1099)].) Similarly, in *People v. Frahs* (2020) 9 Cal.5th 618, 624-625, our high court concluded that a statute that created a pretrial diversion program for certain offenders with mental health disorders applied retroactively. Like in *Lara*, the statute could result " 'in dramatically different and more lenient treatment' " for a class of offenders, and contained no express savings clause limiting the program to prospective-only application. (*Id*. at p. 631.)

12.

However, our high court has declined to extend the reach of *Estrada* to legislative action that does not alter or reduce criminal punishment or treatment for past criminal conduct. For example, in *Brown*, *supra*, 54 Cal.4th at pages 317 through 318, the court rejected the applicability of *Estrada* to a statute that increased the rate at which local prisoners could earn conduct credits. The court explained:

> "The holding in *Estrada* was founded on the premise that ' "[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law" ' [citation] and the corollary inference that the Legislature intended the lesser penalty to apply to crimes already committed. In contrast, a statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent. [The statute at issue] does not alter the penalty for any crime; a prisoner who earns no conduct credits serves the full sentence originally imposed. Instead of addressing punishment for past criminal conduct, the statute addresses future conduct in a custodial setting by providing increased incentives for good behavior." (*Brown*, at p. 325, fn. & italics omitted.)

Ultimately, the applicability of the *Estrada* rule to a particular legislative change depends on whether the statute at issue is " 'analogous' to the *Estrada* situation" and whether the logic of *Estrada* applies. (*Lara*, *supra*, 4 Cal.5th at pp. 311-312.)

The 2017 amendments to section 859.5 are not analogous to the statute at issue in *Estrada*. To the contrary, their effect is to impose requirements on certain interrogations, and to circumscribe the admissibility of those statements if those requirements are not met or excused.[8] In certain instances, the amendments may result in the suppression of

_____

[8] The People rely on *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 300-301, to argue the amendments to section 859.5 constitute procedural changes that only apply prospectively. The People misunderstand the holding in *Tapia*. *Tapia* did not hold that procedural changes are subject only to prospective application. Rather, *Tapia* held that statutory changes affecting the conduct of a trial that had not yet taken place did not involve a question of retroactivity. (*Tapia*, at p. 288.) The amendments to section 859.5 are not mere procedural amendments affecting the conduct of a trial. Rather, the conduct

statements that are damaging to the defense. In others, they may result in the introduction of a recorded statement that undermines any attempt to sow doubt regarding the credibility of an officer's account of an interrogation. (Stats. 2016, ch. 791, § 1, subd. (b) ["Properly recorded interrogations . . . prevent disputes about how an officer conducted himself or herself or treated a suspect during the course of an interrogation, [and] prevent a defendant from lying about the account of events he or she originally provided to law enforcement . . . ."].) The amendments do not, however, alter the substantive requirements for conviction, nor affect the available punishments in the event of conviction. They do not alter or reduce criminal punishment or treatment.

Nor does the logic of *Estrada* apply here. *Estrada* held that a statutory change that ameliorates punishment is presumed to apply retroactively because it reflects a legislative determination that the former punishment was too severe and that a lighter punishment is adequate. (*Estrada*, *supra*, 63 Cal.2d at p. 745.) In amending section 859.5, the Legislature stated: "Properly recorded interrogations provide the best evidence of the communications that occurred during an interrogation, prevent disputes about how an officer conducted himself or herself or treated a suspect during the course of an interrogation, prevent a defendant from lying about the account of events he or she originally provided to law enforcement, and spare judges and jurors the time necessary and the need to assess which account of an interrogation to believe." (Stats. 2016, ch. 791, § 1, subd. (b).) Contrary to defendant's assertion, the amendments were not designed to provide a clear and significant benefit to defendants; they were designed to

_____

regulated by the statute is the interrogation. When an interrogation predates the amendments, applicability of the amendments necessarily requires us to determine whether the amendments should be given retrospective effect. (*People v. Hayes* (1989) 49 Cal.3d 1260, 1274 [concluding that amendments to Evid. Code, § 795, which required the exclusion of prehypnotic testimony unless certain statutory procedures were followed at the time of hypnosis, governed conduct that predated the statute, and thus involved a question of retroactive application].)

14.

reduce biased interpretation of, and ensure the accuracy of the evidence of, the communication that occurs in an interrogation.

Under the strong presumption of prospective application set out in section 3, and in the absence of any indication the Legislature intended the amendments to apply retroactively, we construe the 2017 amendments to section 859.5 to apply only prospectively. (§ 3; accord, *Buycks*, *supra*, 5 Cal.5th at p. 880.)

## II.    Admission of Defendant's Confession[*]

Defendant contends the trial court prejudicially erred in admitting evidence of his confession. He contends the confession was made involuntarily and, relatedly, that the trial court relied on facts not supported by the record in concluding the confession was voluntary. Furthermore, he contends the confession was inadmissible because it occurred after he invoked his privilege against self-incrimination.[9]

### A.    Additional Factual Background

In motions in limine, defendant sought to exclude statements he made to law enforcement on the ground they were the product of unlawful inducement and therefore involuntary. The court conducted an Evidence Code section 402 hearing regarding defendant's statements. Detective Scott testified at the hearing that he interviewed defendant at his home and later in an interview room at the police department. The interview at the police department was video recorded. Defendant was advised of his *Miranda*[10] rights and responded that he understood. The parties stipulated that defendant did not confess to any wrongdoing during the interview in the interview room.

---

[*]    See footnote, *ante*, page 1.

[9]    These arguments are contained in sections I. and IV. of defendant's opening brief. Because the issues are related, we consider them together.

[10]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Scott testified that, after that interview, he took defendant to another area of the department for processing. It took approximately 30 seconds to move defendant, and Scott spent approximately five minutes thereafter gathering defendant's biographical information and entering it into the computer system. At that point, defendant asked whether he could speak with his grandfather. Scott told him no. Scott testified that the department does not permit family members to come to the department to interact with arrestees. According to Scott, defendant then said that "if [Scott] let [defendant] speak with his grandfather he will tell [Scott] what happened" on the date of the incident. Scott responded by stating something to the effect of, "[W]hat are you gonna tell me?" Defendant then asked again to have his grandfather brought down. Scott said, "Well, tell me what you're gonna tell me before I bring your grandfather down here."

The subsequent conversation between defendant and Scott was recorded by Delano Police Officer Bursiaga in four video clips on a cell phone. Defendant was not taken to an interview room but remained in the processing area. Defendant told Scott that he shot Villegas and Ceja. The entire interview lasted approximately five to six minutes.

After the conversation, Scott continued to process defendant. Eventually, defendant's grandfather was brought to the police department and he and defendant were permitted to talk in an interview room. Subsequently, defendant's grandfather left, and defendant was transported to another facility. Defendant made no further statements regarding the incident.

On cross-examination, Scott acknowledged that defendant had mentioned several times, in the interviews at both his house and at the station, that he was the caretaker for his grandfather. Scott also acknowledged that he did not readvise defendant of his rights prior to the last interview in the processing area.

The court denied defendant's motion as follows:

"[T]he defendant reinitiated the conversation along the lines of 'I'll tell you what happened if you let me talk to my grandfather.' The officer did not

16.

say -- as I understand the evidence, did not commit one way or the other.  It was, 'Tell me what happened first and then' -- and at that point, the defendant made the statements to him that are incriminating in nature, and the officer then got the grandfather.

"There was none of the conduct by the officer that suggests that he was overbearing or insistent or highly skeptical in challenging the defendant's statements along the way.  The interview, from what little bit I saw, the part that the defendant was -- did not admit to anything was --- appeared to be relatively low key, which appeared to be somewhat in the nature of the overall testimony of the detective or investigator Scott.

"And the booking process from the audio clips and the testimony of Detective Scott again continued to be a very low-key approach on this interview.  And there's nothing in there that suggests to me that [defendant] was manipulated or induced in such a fashion that would taint the admissions to the investigator regarding his involvement in the killing of the two individuals.

"So I don't find that there's any basis to suppress the statements that were made.  There was no incentive that was offered by the officer that would overbear the will of [defendant] to make him make an involuntary statement.  The best we have is [defendant] offering a bargain of 'Let me talk to my grandfather and I'll tell you what happened,' and the officer saying, 'Well, you tell me what happened, and then you can talk to your grandfather.'  I don't see anywhere in that that it's inadmissible or a statement that overbeared [*sic*] the will of [defendant] such as to make it in any way less than a statement that was voluntarily given by [defendant]."

## B.     Applicable Law Regarding Confessions

The law applicable to defendant's challenges is set out by our Supreme Court in

*People v. McCurdy* (2014) 59 Cal.4th 1063 (*McCurdy*):

"The applicable law is settled:  ' "As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'  [Citations.]" '  [Citation.]

" ' " '[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citation], at least during the prosecution's case-in-chief [citations]." [Citation.] "Critically, however, a suspect can waive these rights." [Citation.]' [Citation.] 'The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." [Citation.]' [Citation.]

"In addition, '[t]he due process clause of the Fourteenth Amendment precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion.' [Citation.] ' "The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." ' [Citation.]" [Citation.] " '[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record. [Citations.]' " [Citation.]' [Citation.]" (*McCurdy*, *supra*, 59 Cal.4th at pp. 1085-1086, italics omitted.)

## C.    The Trial Court's Factual Findings

Defendant contends the trial court erroneously found that he reinitiated the conversation with Scott by offering to make a further statement if Scott let him talk to his grandfather. According to defendant, the court neglected to find that it was Scott's refusal to let defendant speak with his grandfather that precipitated defendant's offer to make a further statement.

We need not resolve this question for purposes of our review. There is no factual dispute regarding the contents of Scott's testimony. While we must defer to the trial court's findings regarding conflicts in the evidence and inferences to be drawn therefrom

18.

when such findings are supported by substantial evidence (*McCurdy*, *supra*, 59 Cal.4th at p. 1086; *People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*)), Scott's account of the events leading to defendant's confession is not in dispute.

In any event, we find no error. Defendant asked to speak with his grandfather. Scott refused. Defendant then offered to tell Scott what had occurred on the date of the incident if he was permitted to speak with his grandfather. Scott asked defendant, "[W]hat are you gonna tell me?" Defendant then asked to have his grandfather brought in. Scott told defendant, "Well, tell me what you're gonna tell me before I bring your grandfather down here." Defendant then made his statement. The court summarized this testimony as follows: "[T]he defendant reinitiated the conversation along the lines of 'I'll tell you what happened if you let me talk to my grandfather.' The officer did not say -- as I understand the evidence, did not commit one way or the other. It was, 'Tell me what happened first and then' -- and at that point, the defendant made the statements to him that are incriminating in nature, and the officer then got the grandfather." Although the court's summation of the facts omitted some details, particularly that Scott initially refused defendant's request to see his grandfather, the court's summation of facts is supported by substantial evidence.

We must independently review whether these facts demonstrate that the confession was voluntary and in compliance with *Miranda*. (See *McCurdy*, *supra*, 59 Cal.4th at pp. 1085-1086; *Tully*, *supra*, 54 Cal.4th at p. 979.)

### D. Voluntariness of Defendant's Confession

A statement obtained by a direct or implied promise, however, slight, is considered involuntary. (*Hutto v. Ross* (1976) 429 U.S. 28, 30; *People v. McWhorter* (2009) 47 Cal.4th 318, 347 (*McWhorter*); *People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*).) Such promises defeat an inference that the suspect's decision to speak is self-motivated and free from a promise of reward or advantage. (*Tully*, *supra*, 54 Cal.4th at p. 985.) However, "[a] confession is 'obtained' by a promise within the proscription of

19.

both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation." (*People v. Benson* (1990) 52 Cal.3d 754, 778; accord, *People v. Williams* (2010) 49 Cal.4th 405, 437 (*Williams*).) In evaluating this question, we must examine " ' " 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " ' " (*McWhorter*, *supra*, 47 Cal.4th at p. 347.)

In cases where an accused has alleged his or her confession was improperly induced by a promise, the promise has generally involved leniency for the accused or a close family member or associate. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209-214 [collecting cases, and concluding the defendant's confession was involuntary because the police "repeatedly suggested [he] would be treated more leniently if he confessed"]; see *People v. Steger* (1976) 16 Cal.3d 539, 550 ["A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid"]; *People v. Perez* (2016) 243 Cal.App.4th 863, 876 [concluding officer's promise not to charge the defendant if he told the truth was an express promise of leniency that required suppression of the confession]; *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1404 [concluding police officer's statements constituted implied promises of leniency for the defendant's girlfriend, but that the confession was not coerced because the defendant was sophisticated and knew the officer's implied promises were hollow].) These cases frequently involve a threat: that the accused's family or friends will face grave consequences if the accused does not confess. (*McWhorter*, *supra*, 47 Cal.4th at pp. 342, 348 [threats to charge the defendant's wife as an accessory if he did not confess rendered confession involuntary]; *Dowdell*, at p. 1402 [police emphasized the defendant needed to " 'save' " his pregnant girlfriend from possible life imprisonment by confessing]; cf. *Steger*, at p. 550 [police made no threat or promise— either express or implied—regarding fate of the defendant's husband; the defendant's desire to aid her husband by confessing was entirely self-motivated].)

20.

Here, the promise of reward, if any, did not involve leniency, but rather an opportunity for defendant to speak with his grandfather prior to being transported. There was no threat to defendant if he did not confess. At most, his opportunity to speak with his grandfather would have been delayed. Defendant does not cite, and we do not find, any cases suppressing a confession on a similar basis. (Cf. *People v. Dreas* (1984) 153 Cal.App.3d 623, 629, 632 [rejecting the defendant's claim that temporary denial of the use of a telephone to call a friend until after booking and interview did not constitute coercive conduct]; *People v. Stoner* (1962) 205 Cal.App.2d 108, 115 ["It strains one's credulity to suggest that [the] defendant would involuntarily confess to a crime merely because he was required to wait before making a telephone call."], reversed on other grounds by *Stoner v. California* (1964) 376 U.S. 483.)

Moreover, we find it significant that it was defendant himself who raised the possibility of speaking with his grandfather in exchange for his confession. (See *People v. Barker* (1986) 182 Cal.App.3d 921, 929-933 [determining confession was voluntary where the defendant initiated the discussion of lenient treatment for his girlfriend].) While defendant makes much of the fact that this offer came only after Scott refused to let him speak with his grandfather, Scott testified his refusal was based on ordinary procedure. (See *McWhorter*, *supra*, 47 Cal.4th at pp. 354-358 [holding that a confession was not involuntary where the defendant's wife was brought to the police station for a legitimate reason, and not for the purpose of encouraging the defendant to confess]; *People v. Jackson* (1971) 19 Cal.App.3d 95, 100 [that officers had a legitimate basis for detaining the defendant's wife supported a conclusion the defendant's confession was not coerced and that his wife was not held in custody solely for the purpose of securing his confession].) Scott did not offer defendant any benefit in exchange for his confession; rather, defendant offered his confession in exchange for a benefit. On these facts, we cannot conclude that an offer by Scott was the motivating factor behind defendant's

decision to confess. (See *Tully*, *supra*, 54 Cal.4th at p. 985 [promise of leniency must be a " 'motivating cause of the decision to confess' "].)

Finally, nothing else about the interviews suggest coercion. The trial court found that both interviews were "low key" and that Scott was not overbearing or insistent in his approach. Defendant does not dispute this characterization. Nothing about the characteristics of the accused or the conditions of the interrogation suggest defendant's will was overborne when he confessed. (*McWhorter*, *supra*, 47 Cal.4th at p. 347; accord, *Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [the test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed"].)

Considering the totality of the circumstances surrounding the confession, we conclude the confession was voluntary. (*McCurdy*, *supra*, 59 Cal.4th at p. 1086.)

### E. Alleged Invocation of *Miranda* Rights

Defendant contends he invoked his right to remain silent at the conclusion of the interview in the interview room, and that his subsequent confession in the processing area violated *Miranda*.

We first note that this issue is forfeited. Below, defendant's briefing contained boilerplate references to the confession violating *Miranda*. Defendant noted in passing that there was no readvisement of *Miranda* rights during the processing interview. However, he did not identify any instance in which he claimed to have invoked his right to remain silent. The trial court was not apprised that it was being called upon to decide this issue. (*People v. Holt* (1997) 15 Cal.4th 619, 666; *People v. Ray* (1996) 13 Cal.4th 313, 339.) Nonetheless, we address the issue on the merits given defendant's claim that counsel was constitutionally ineffective for failing to raise it. (See *People v. Hardy*, *supra*, 2 Cal.4th at p. 209.)

In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial

interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda*, *supra*, 384 U.S. at p. 444.) Thus, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." (*Thompson v. Keohane* (1995) 516 U.S. 99, 107.)

The waiver of *Miranda* rights may be express or implied. (See *North Carolina v. Butler* (1979) 441 U.S. 369, 373-375.) However, the invocation of the right to remain silent or the right to counsel must be unambiguous and unequivocal. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381-382.) The suspect must articulate his desire to remain silent or have counsel present with sufficient clarity that a reasonable police officer in the same circumstances would understand the statement to be an invocation of the suspect's constitutional rights. (*Davis v. United States* (1994) 512 U.S. 452, 459.) If a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.) A suspect's "simple, unambiguous" statement that he "wanted to remain silent or that he did not want to talk with the police" is generally sufficient to invoke his " ' "right to cut off questioning." ' " (*Berghuis*, at p. 382.)

A suspect who has waived his *Miranda* rights may later invoke them during the interrogation. If he clearly and unequivocally does so, police must stop questioning. (*Edwards v. Arizona* (1981) 451 U.S. 477, 485; *Miranda*, *supra*, 384 U.S. at pp. 473-474; *People v. Stitely* (2005) 35 Cal.4th 514, 535.) However, if the suspect thereafter voluntarily reinitiates contact with the police, the interrogation may resume. (*Edwards*, at p. 485; *People v. Gamache* (2010) 48 Cal.4th 347, 384.) Whether readvisement of *Miranda* rights is required following a break in questioning depends on several factors. (*People v. Duff* (2014) 58 Cal.4th 527, 555 (*Duff*).)

Here, defendant's interview in the interview room concluded as follows:

23.

"SCOTT:              All right, man, we're leavin' – we're leavin' the room.

"[DEFENDANT]:   All right.

"SCOTT:              You wanna tell me?

"[DEFENDANT]:   I won't tell you (unintelligible).  I got nothin' to say, bro.

"SCOTT:              (Unintelligible).

"[DEFENDANT]:   You know I mean?

"SCOTT:              (Unintelligible).

"[DEFENDANT]:   Better off my chances in there (unintelligible) somethin'.

"SCOTT:              (Unintelligible).

"[DEFENDANT]:   (unintelligible)."

Defendant contends his statement, "I won't tell you (unintelligible).  I got nothin' to say, bro," was an unequivocal invocation of his right to remain silent.  However, this statement does not constitute an unambiguous and unequivocal directive to end the interview.  (*Williams*, *supra*, 49 Cal.4th at pp. 433-434 [suspect's statement, " 'I don't want to talk about it,' " was not an invocation of *Miranda* rights]; *People v. Ashmus* (1991) 54 Cal.3d 932, 969-970 [" 'now I ain't saying no more' " was not an invocation of the right to remain silent], abrogated on another ground by *People v. Yeoman* (2003) 31 Cal.4th 93, 117; *People v. Silva* (1988) 45 Cal.3d 604, 629-630 [" 'I really don't want to talk about that' " was not an invocation of *Miranda* rights].)  The statement did not come before the interrogation got underway, but rather at the conclusion of a lengthy interview, after Scott indicated he was leaving the room.  (*People v. Case* (2018) 5 Cal.5th 1, 21 [distinguishing invocation of right to silence before the interrogation is in process, from that which cuts off a particular line of questioning during an ongoing interrogation].)  Defendant also continued to speak thereafter.  In this context, a reasonable officer could interpret defendant's statement as a continued denial of any knowledge concerning the

crime, or an expression of frustration with the nature of the questioning, rather than an attempt to terminate the interrogation. (*Williams*, at pp. 433-434.)

Defendant also appears to contend Scott was required to readvise him of his *Miranda* rights prior to questioning him again in the booking area. " '[R]eadvisement prior to continued custodial interrogation is unnecessary "so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' " ' " (*Duff*, *supra*, 58 Cal.4th at p. 555.) " 'The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and "[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights." ' " (*Ibid*.) Here, Scott was not required to readvise defendant, because the second interrogation occurred mere moments after the first and was conducted by the same interrogator, in the same facility (albeit in another room). Additionally, defendant demonstrated no reluctance to be interviewed but instead volunteered to provide information. On these facts, Scott did not have to remind defendant of his rights.

Finally, we reject defendant's attempt to liken his interrogation to that presented in *Neal*, *supra*, 31 Cal.4th 63. In *Neal*, the defendant invoked his right to remain silent at the outset of the interrogation, and also repeatedly invoked his right to counsel, which invocations were intentionally disregarded by officers who continued their substantive interrogation. (*Id*. at pp. 81-82.) When the defendant failed to incriminate himself, the interrogating officers placed him in a cell overnight without food, drink, or toilet facilities. (*Id*. at p. 82.) The following day, the defendant initiated another interview, where he immediately confessed. (*Id*. at p. 81.) He confessed again in a third interview initiated by officers. (*Ibid*.) However, because the invocation of his *Miranda* rights was not honored in the first interview, and because he was threatened with " 'heavier' "

25.

charges if he did not cooperate, our Supreme Court determined the confessions were involuntary. (*Id.* at pp. 81-84.) In contrast, here, defendant did not invoke his *Miranda* rights at any point in the interrogation, nor was he threatened with any penal consequences for his failure to cooperate.

We conclude defendant's confession was not elicited in violation of his *Miranda* rights.

## III.    Instruction on Voluntary Intoxication[*]

The court's instruction on voluntary intoxication omitted the word, "or." Defendant contends this error changed the meaning of the instruction in such a way as to erroneously inform the jury that the question of premeditation and deliberation had already been decided, and that voluntary intoxication could not negate deliberation and premeditation. We conclude there is no reasonable possibility the jury interpreted the instruction as defendant suggests and, in any event, any error was harmless.

### A.    Additional Factual Background

The court instructed the jury on the elements of first degree murder, including the requirement that the defendant act willfully, deliberately, and with premeditation. The court additionally instructed the jury with a modified version of CALCRIM No. 625, concerning voluntary intoxication.[11]

The model instruction for CALCRIM No. 625 in effect at the time of trial read, as it does now, as follows:

> "You may consider evidence, if any, of the defendant's voluntary
> intoxication only in a limited way. *You may consider that evidence only in*
> *deciding whether the defendant acted with an intent to kill[,] [or] [the*

---

[*]    See footnote, *ante*, page 1.

[11]    Defendant did not object to the instruction in the trial court. However, because defendant claims the instruction affected his substantial rights, we reach the merits of the argument despite the People's claim of forfeiture. (§ 1259; see *People v. Nelson* (2016) 1 Cal.5th 513, 543.)

*defendant acted with deliberation and premeditation[,]] [[or] the
defendant was unconscious when (he/she) acted[,]] [or the defendant ____
<insert other specific intent required in a homicide charge or other
charged offense>.]*

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by
willingly using any intoxicating drug, drink, or other substance knowing
that it could produce an intoxicating effect, or willingly assuming the risk
of that effect.

"You may not consider evidence of voluntary intoxication for any other
purpose." (CALCRIM No. 625, some italics added.)

The court's oral instruction was presented as follows:

"You may consider evidence, if any, of the defendant's voluntary
intoxication only in a limited way. *You may consider that evidence only in
deciding whether the defendant acted with an intent to kill. The defendant
acted with deliberation and premeditation.* A person is voluntarily
intoxicated if he or she becomes intoxicated by willingly using any
intoxicating drug, drink or other substance knowing that it could produce an
intoxicating effect or willingly assume the risk of that effect. You may not
consider evidence of voluntary intoxication for any other purpose." (Italics
added.)

The court's written instruction was presented as follows:

"You may consider evidence, if any, of the defendant's voluntary
intoxication only in a limited way. *You may consider that evidence only in
deciding whether the defendant acted with an intent to kill, *[the defendant
acted with deliberation and premeditation,]**

"A person is voluntarily intoxicated if he or she becomes intoxicated
by willingly using any intoxicating drug, drink or other substance knowing
that it could produce an intoxicating effect, or willingly assuming the risk
of that effect.

"You may not consider evidence of voluntary intoxication for any
other purpose." (Italics added, original brackets & asterisks.)

## B.  Analysis

We independently determine whether instructions correctly state the law. (*People
v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error or

ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4; *Boyde v. California* (1990) 494 U.S. 370, 380 (*Boyde*).)  We also consider the arguments of counsel in assessing the probable impact of the instruction or instructions on the jury.  (*People v. Young* (2005) 34 Cal.4th 1149, 1202; see *Weeks v. Angelone* (2000) 528 U.S. 225, 236.)  " 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.]  When a defendant claims an instruction was subject to erroneous interpretation by the jury, he must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted. [Citation.]  In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926.)

Here, both the oral and written instructions provided by the court deviated from the model instruction in their grammatical structure by omitting the word "or." Additionally, the written instruction referred to premeditation and deliberation in an unexplained, bracketed parenthetical, while transcription of the oral instruction suggests the reference to premeditation and deliberation was a separate, stand-alone sentence. Defendant claims that the effect of both instructions was to inform the jury that evidence of voluntary intoxication was relevant only to the question of whether defendant acted with the intent to kill, and that the issue of premeditation and deliberation was already decided.  However, "[w]e credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions." (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  In our view, there is no reasonable likelihood the jury would parse the instruction in the way

defendant suggests. (See *People v. Kelly* (2007) 42 Cal.4th 763, 791; see also *Boyde*, *supra*, 494 U.S. at pp. 380-381.)

Significantly, the jury was instructed that it could find defendant guilty of first degree murder only if the People proved, beyond a reasonable doubt, that he acted willfully, deliberately, and with premeditation. The instructions defined each of these terms at some length. In closing argument, the prosecutor stated the issues in the case were "pretty limited," to the issues of whether defendant was the shooter and whether he acted with premeditation and deliberation. The prosecutor then argued facts he believed showed premeditation and deliberation as to each victim.[12] Considering this record, we see no reasonable likelihood the jury could have interpreted the instruction on voluntary intoxication to mean the issues of premeditation and deliberation already were decided.

Nor do we find it reasonably likely the jury interpreted this instruction to mean that voluntary intoxication could not be considered in determining whether defendant acted with premeditation or deliberation. Again, the written instruction provided: "You may consider that evidence only in deciding whether the defendant acted with an intent to kill, *[the defendant acted with deliberation and premeditation, ]*." Defendant contends the only rational interpretation of this instruction "is that the jury was allowed to consider evidence of voluntary intoxication only on the question of whether [defendant] acted with an intent to kill, not whether he acted with deliberation and premeditation." We do not find this to be a rational interpretation. The phrase "the defendant acted with deliberation and premeditation" was linked to the preceding material within the same sentence by a comma. The phrase was followed by another comma and additional material that was struck through with a marker. Despite the brackets and asterisks,[13] the structure of the

---

[12] Defense counsel did not address premeditation or deliberation in closing argument, and instead argued the People had not proved defendant was the shooter.

[13] Brackets, asterisks, and strike throughs appeared throughout the written instructions, which appear to have been modified directly from printouts of form

instruction clearly indicates the issue of voluntary intoxication could be considered in determining whether the defendant acted with deliberation and premeditation. The omission of the word "or" was a minor deviation that did not "materially alter the instruction's meaning." (*People v. Huggins* (2006) 38 Cal.4th 175, 192 (*Huggins*) [concluding the omission of the word "and" from an instruction defining mental incompetence for purposes of a competency hearing "did not materially alter the instruction's meaning"].)

The oral instruction differed slightly in form from the written instruction, in that it obviously did not include the brackets, asterisks, or strike-through markings. Additionally, the relevant portion of the instruction was transcribed in two sentences as follows: "You may consider that evidence only in deciding whether the defendant acted with an intent to kill. The defendant acted with deliberation and premeditation." " 'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) Nonetheless, we reject defendant's contention that the separation of this phrase into two sentences in the transcript precluded the jury from considering voluntary intoxication when deciding the question of premeditation and deliberation. We are not bound by the transcribed punctuation:

> "Of course, when the court orally instructs the jury, the court reporter cannot always capture and report the court's intended punctuation. Speakers seldom indicate punctuation as they speak, leaving the court reporter with the always difficult, and sometimes impossible, task of supplying punctuation that reflects the speaker's cadence and inflection. Although we rely upon the court reporter to accurately record the words spoken in court, we are not bound by the court reporter's interpretation of the speaker's intended meaning as shown by the punctuation inserted by the reporter." (*Huggins*, *supra*, 38 Cal.4th at p. 190.)

instructions. Given the prevalence of such markings, we reject defendant's contention that the jury interpreted these notations in the instruction on voluntary intoxication to represent "the trial court's voice or [a] parenthetical note to the jury."

30.

Moreover, even if the instruction was ambiguous, the instruction was harmless. The California Supreme Court has held that an instructional error restricting a jury's consideration of voluntary intoxication would have the effect of excluding defense evidence and amounts to state law error only. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135; accord, *People v. Bedolla* (2018) 28 Cal.App.5th 535, 545.) Accordingly, we apply the standard set out in *People v. Watson* (1956) 46 Cal.2d 818, 836, and will reverse only if we find a " 'reasonable probability the error affected the verdict adversely to defendant.' " (*Mendoza*, at pp. 1134-1135.) We find no such probability.

First, defendant's own account of the shooting does not suggest defendant's ability to premeditate or deliberate was inhibited by intoxication. Although there was evidence that defendant had been drinking for some time before the shootings, he confessed that he shot Villegas because Villegas had not paid him, and shot Ceja because Ceja was a witness. He did not suggest his judgment was affected by intoxication. Second, defendant did not actually argue a voluntary intoxication defense to the jury, and the prosecutor likewise did not address this defense. Lastly, the jury was instructed that murder in the first degree requires the unlawful intent to kill, and that it could consider the effect of voluntary intoxication on this issue. In finding defendant guilty, the jury necessarily rejected this defense. Considering the entire charge of the court and the presentation of the case, it is inconceivable that a jury would have concluded defendant was too intoxicated to premeditate and deliberate the murders, but not too intoxicated to form an intent to kill. (*People v. Chun* (2009) 45 Cal.4th 1172, 1204-1205 [finding error harmless where jury verdict on other points effectively resolves the disputed point]; see *People v. Castillo* (1997) 16 Cal.4th 1009, 1017 ["No reasonable juror would understand the instructions to permit the jury to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated."].)

We find no reasonable likelihood the jury would misunderstand the instructions in the way defendant suggests, nor any reasonable probability that different instructions would have resulted in a verdict more favorable to defendant.

## IV.    Instruction on Flight[*]

Defendant contends the trial court prejudicially erred in instructing the jury on flight, over a defense objection, because there was no evidence to support a conclusion that defendant fled.[14]  We disagree.

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.]  " '[F]light requires neither the physical act of running nor the reaching of a far-away haven.  [Citation.]  Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " [Citation.]  "*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so." ' " (*People v. Cage* (2015) 62 Cal.4th 256, 285.)  "[T]he facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt." (*People v. Mason* (1991) 52 Cal.3d 909, 941.)  The evidence of flight need not be uncontradicted.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)  "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, original italics.)

---

[*]      See footnote, *ante*, page 1.

[14]     The court instructed the jury with CALCRIM No. 372 as follows:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude the defendant fled, it's up to you to decide the meaning and importance of that conduct.  However, evidence the defendant fled cannot prove guilt by itself."

Here, Roberto and Roland both testified that they saw defendant leave Villegas's house soon after the shooting, heading in the direction of his own house. However, they did not describe any specific circumstances of his departure that would warrant an inference defendant acted with consciousness of guilt or with a purpose to avoid being observed or arrested, particularly given Lounito's testimony that defendant returned to the scene of the offense some time thereafter and began picking up spent shells. (See *People v. Cage*, *supra*, 62 Cal.4th at p. 285.)

In addition to this evidence, however, defendant told Scott that he went to sleep after the shooting, then woke up later that night and drove to Bakersfield, where he went to a gas station and then to a "chop shop" to melt down the gun. Departure from the area of the crime and defendant's "usual environs" for purposes of disposing of the weapon used in the crime "logically permits an inference that [defendant's] movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal.3d 668, 694.) Ultimately, it was for the jury to decide the significance, if any, attributable to that conduct.

Moreover, even if the instruction was unwarranted, defendant cannot establish prejudice. The instruction did not presuppose the existence of flight, but instead left it up to the jury to determine whether defendant's conduct constituted flight, and if so, the weight it was entitled to. (*People v. Visciotti* (1992) 2 Cal.4th 1, 60-61 [finding erroneously given flight instruction harmless because "the instruction did not assume that flight was established, leaving that factual determination and its significance to the jury"].) "In the absence of any evidence of flight . . . , the jury would have understood that the instruction was to that extent inapplicable." (*People v. Elliott* (2012) 53 Cal.4th 535, 584; see *Visciotti*, at p. 61.) There was ample evidence, other than flight, tying defendant to the murders. Based on this record, any error in the giving of CALCRIM No. 372 was harmless. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) We reject defendant's claim to the contrary.

## **DISPOSITION**

The judgment is affirmed.

DETJEN, J.

WE CONCUR:

LEVY, Acting P.J.

FRANSON, J.

34.